AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Kansas

**FILED**
**U.S. District Court**
**District of Kansas**

07/10/2026

**Clerk, U.S. District Court**
**By:__AS__Deputy Clerk**

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The premises of 428 N. Massachusetts Street, Erie, Kansas 66733 and Richard MITCHELL, as further described in Attachment A-1 and Attachment A-2 | )<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No.  26-M-__6154___-01-BGS |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

The premises of 428 N. Massachusetts Street, Erie, Kansas 66733 and Richard MITCHELL, as further described in Attachment A-1 and Attachment A-2

located in the _____ District of _____Kansas_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251;<br>18 U.S.C. §§ 2252(a), 2422(b), 1470 | Production of child pornography; Receipt and Possession of child pornography or attempt; Coercion and enticement of a minor or attempt; Transfer of obscene matter to a minor or attempt |

The application is based on these facts:

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

David Albers, TFO, FBI
*Printed name and title*

Sworn to before me via Zoom.

Date:  7/10/2026

*Judge's signature*

City and state:  Wichita, Kansas

Honorable Brooks G. Severson, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN THE MATTER OF THE SEARCH OF:
428 N. Massachusetts Street, Erie, Kansas
66733 and Richard MITCHELL

Case No. _____26-6154-BGS_____

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, David Albers, being duly sworn, declare and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 428 N. Massachusetts Street, Erie, Kansas 66733 (the "SUBJECT PREMISES"), as further described in Attachment A-1, and the person of Richard MITCHELL (the "SUBJECT PERSON"), as further described in Attachment A-2, for the items to be seized described in Attachment B.

2.      I am currently employed as a Detective with the Kansas City, Missouri Police Department and am serving as a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI"). I have been employed with the Kansas City, Missouri Police Department since March 1998, and am currently assigned to the FBI Child Exploitation Task Force, Kansas City, Missouri. Since May 2013, I have been assigned to investigate computer crimes to include violations against children. I have gained expertise in the conduct of such investigations through training in seminars, classes, and everyday work related to conducting these types of investigations. I have attended training such as the annual Crimes Against Children Conference and Innocent Images training provided by the FBI. These training courses have included instruction related to the laws against sexual abuse of minors, online applications used to entice

children to produce sexually explicit material or engage in sexually explicit conduct with adults, and other subjects related to offenses committed against minor children. I have assisted in the investigation of hundreds of child pornography cases. During that time, I have had to view thousands of images of child pornography. I have previously applied the federal definition of child pornography used in this Affidavit to dozens of search warrant applications and in dozens of grand jury presentations.

3.      At all times throughout this Affidavit, I use the terms "child pornography" and child sexual abuse material ("CSAM"), merely as shorthand to refer to visual depictions of actual minors engaged in sexually explicit conduct. I use the terms "visual depiction," "minor," and "sexually explicit conduct" as those terms are defined in 18 U.S.C. § 2256 (*See* Definition Section below).

4.      This Affidavit is made in support of a search warrant for the premises located at 428 N. Massachusetts Street, Erie, Kansas 66733 (the "SUBJECT PREMISES"), as further described in Attachment A-1, and the person of Richard MITCHELL (the "SUBJECT PERSON"), as further described in Attachment A-2, for the items to be seized described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2251 (production of child pornography or attempt), 2252(a) (receipt and possession of child pornography or attempt), 2422(b) (coercion and enticement of a minor or attempt), and 1470 (transfer of obscene matter to a minor or attempt) (collectively, the "Subject Offenses"). I am requesting authority to search the entire premises, including the residential dwelling and any computer and computer media located therein where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of crime.

5.      The facts set forth in this Affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the

requested warrants and does not purport to set forth all my knowledge of or investigation into this matter.

## STATUTORY AUTHORITY

6.      This investigation concerns alleged violations of 18 U.S.C. §§ 2251, 2252(a), 2422(b), and 1470 relating to the sexual exploitation of minors.

a.      18 U.S.C. § 2251(a) prohibits a person from knowingly employing, using, persuading, inducing, enticing or coercing any minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, or from attempting to do so.

b.      18 U.S.C. § 2252(a) prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, or possessing any visual depiction of minors engaging in sexually explicit conduct when such visual depiction was either mailed or shipped or transported in interstate or foreign commerce by any means, including by computer, or when such visual depiction was produced using materials that had traveled in interstate or foreign commerce, or from attempting to do so.

c.      18 U.S.C. § 2422(b) prohibits a person from using the mail or any facility or means of interstate or foreign commerce to knowingly persuade, induce, entice, or coerce any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or from attempting to do so.

d.      18 U.S.C. § 1470 prohibits a person from using the mail or any facility or means of interstate or foreign commerce to knowingly transfer obscene matter to another individual who has not attained the age of 16 years, knowing that such other individual has not attained the age of 16 years, or attempting to do so.

3

## BACKGROUND OF THE INVESTIGATION

7.      On Thursday, June 26, 2026, Affiant and an FBI Special Agent ("SA") conducted an interview of an adult male ("SUBJECT 2").[1] This interview was done as part of an investigation stemming from a citizen complaint alleging SUBJECT 2 had expressed a desire for an adult male to sexually abuse his purported minor daughter. During the interview, SUBJECT 2 admitted to using a few different online platforms to communicate with other individuals about the sexual abuse of minors. SUBJECT 2 also admitted that SUBJECT 2 regularly claimed to have a nine-year-old daughter whom SUBJECT 2 was sexually abusing. SUBJECT 2 denied ever meeting anyone in person for this purpose. At the conclusion of the interview, SUBJECT 2 provided consent for the FBI to assume SUBJECT 2's online identity on two of the online platforms  to attempt to identify individuals interested in the sexual abuse of children.

8.      On the same date, an FBI agent logged into SUBJECT 2's Adam4Adam[2] online account and conducted a review of SUBJECT 2's communications with other individuals. Affiant observed a message thread between SUBJECT 2 and the user "Rick691981" later confirmed to be Richard MITCHELL (the "SUBJECT PERSON"). The first available communications began on June 25, 2026, but appeared to be a continuation of prior communications that had been previously deleted. The first few messages between SUBJECT 2 and MITCHELL were from MITCHELL who said, "Are we still going to do this tonight," and "I would love to lick her pussy if you will let me and we can fuck if you want to." SUBJECT 2 sent two images of apparent Child Sexual Abuse Material (CSAM) to MITCHELL on that same day. The first images depicted a nude, prepubescent female lying on her back with her legs spread apart with the lascivious exhibition of her genitals

---

[1] Subject 2's name and identity are known to law enforcement. Subject 2 is referred to as "Subject 2" due to a law enforcement pending investigation of this individual and others.

[2] Adam4Adam or A4A is a location-based social networking and dating platform designed primarily for gay, bisexual, transgender, and curious men.  Users can find matches based on proximity and see who is currently online to send direct messages.

and anus. SUBJECT 2 followed the image by saying, "A photo she has taken before on my phone." MITCHELL then replied, "I want to fuck her." SUBJECT 2 then said, "She is sexual for her age at times." MITCHELL later said, "I really want to see her cute little asshole." SUBJECT 2 resent the first image and a second image depicting a nude, apparent minor female positioned on her stomach with her buttocks sticking up. Her hand is pulling her vagina and anus apart. MITCHELL responded, "You're making me so horny I like to fuck her right now." SUBJECT 2 and MITCHELL then discussed having sexual intercourse with each other while the purported minor participates. SUBJECT 2 then said, "I just love the thought of another man playing with my daughter;" and MITCHELL said, "I'm ready;" and "I will finger her pussy and get it really wet then put my dick in her." MITCHELL sent SUBJECT 2 a photo of his penis[3] and later asked if SUBJECT 2 showed the photo to the purported daughter and checked to see if she wanted to "play with it." MITCHELL asked, "Can you put your finger in her pussy and take a picture for me I would love to see that." MITCHELL asked for similar images two more times toward the end of the conversation on that day.

9.     On Friday, June 26, 2026, MITCHELL provided his phone number to be (620) 926-8107, and SUBJECT 2 and MITCHELL continued to exchange voice calls and messages about wanting to make plans to meet, using both the application and the cellular phone number. SUBJECT 2 was not responding and MITCHELL continued to send several messages to include the following: "Did you find somebody else to play with her pussy instead of me;" "I was ready to go I even bought her a couple toys and few other things;" "Are you going to let somebody else fuck your daughter;" " I got a real dildo;" and "I was keeping everything a secret between us."

---

[3] The image of the penis MITCHELL sent SUBJECT 2 contains a distinct blanket in the image, which your Affiant believes may be located in the SUBJECT PREMISES. After MITCHELL sent the image of a penis to SUBJECT 2, MITCHELL asked that the image be shown to the minor daughter, which would constitute a violation of Attempted Transfer of Obscene Material, in violation of 18 U.S.C. § 1470.

MITCHELL then sent an image depicting the lascivious exhibition of an apparent minor female's genitals. It appeared that MITCHELL created the image by taking a screenshot of an image originally sent to him by SUBJECT 2 because SUBJECT 2's username could be seen in the image. MITCHELL sent a second image of an age-difficult nude female's buttocks with her hands placed to spread her buttocks apart to expose her anus. The communications between MITCHELL and SUBJECT 2 on this date occurred before FBI became involved and assumed SUBJECT 2's identity on online platforms.

10.     On Saturday, June 28, 2026, and Sunday, June 29, 2026, MITCHELL appeared to be upset about not getting a response from SUBJECT 2 by stating, "…if you want to piss me off I can make you miserable or I can make you happy;" and "Watch and see the joke will be on you."

11.     On Saturday, July 4, 2026, MITCHELL sent another message attempting to reinitiate communication, but a response back to MITCHELL was not sent at that time.

12.     On Tuesday, July 7, 2026, at 11:30am, an FBI Online Covert Employee ("OCE-6249") posing as SUBJECT 2 sent a response to MITCHELL apologizing for the lack of responses. At 11:14pm, MITCHELL responded with, "So when do I get to fuck her." Other messages from MITCHELL included, "Can you get me a couple new pictures of her pussy and her asshole I want to put my tongue in it;" "I'm getting a new phone number tomorrow my new phone number is 620-448-4617 when can we all three get together;" "I'll pay for the gas if you want to come and get me I want to play with that pussy;" and "If things are still on let me know I'd like to get together with you I really want to eat that pussy and I'd like to try to put my dick in her if you want me to I would even shoot my load in her if you want let me know in the morning or tonight if you can't get a hold of me here get a hold of me I'm a new number."

13.     On Wednesday, July 8, 2026, OCE-6249 responded and explained SUBJECT 2 and the purported daughter had to move to Kansas City, Missouri for a new job as part of the reason

for the lack of responses. At 8:09pm, MITCHELL responded, "I would like to fuck her all the time if you will let me," "Can I see her sexy pussy again I want to eat it before I fuck it," "I would be interested in coming up there and staying with you for a few days if you want me to and we can all be together and have a lot of fun," and "I want to see if I can get my dick in her pussy and I would love to cum in her pussy and then you can fuck her after I get done fucking her because I should be able to get her pussy opened up enough we can both fuck her all the time if she likes it."

14.    OCE-6249 provided MITCHELL with a phone number so an FBI Undercover Employee ("UCE-12458") could participate in any future voice calls with MITCHELL since MITCHELL repeatedly had calls to SUBJECT 2 and MITCHELL expressed wanting to talk again. Text communications and voice calls continued between UCE-12458 and MITCHELL. UCE-12458 inquired when MITCHELL wanted to meet.  MITCHELL responded, "Soon as possible I'm ready to try and fuck her if you want me to try and get my dick in her" and "Can I see her pussy." UCE-12458 explained he was low on money to make a trip down to MITCHELL and MITCHELL said, "I got some money. I want her pussy." MITCHELL continued to reiterate the sexually explicit conduct he was going to do to SUBJECT 2's purported daughter. MITCHELL explained that somebody would be at his house, so they needed to seek an alternative location. UCE-12458 advised that the earliest they could meet MITCHELL would be Friday, July 10, 2025, around noon. MITCHELL advised there were hotels near his residence. UCE-12458 and MITCHELL discussed meeting at a park in Erie, Kansas, which is within walking distance of MITCHELL's residence the ("SUBJECT PREMISES"). MITCHELL said that he would get the hotel room when they arrived. During a voice call between UCE-12458 and MITCHELL, UCE-12458 reiterated that the purported daughter was nine years old, and MITCHELL again reiterated in detail the sexually explicit conduct MITCHELL was going to do to her.

15.     On July 9, 2026, MITCHELL informed UCE-12458 that MITCHELL would arrive to the planned meeting at the park in Erie, Kansas in white Jeep.

## SUBJECT IDENTIFICATION

16.     On July 08, 2026, an FBI Special Agent with the Kansas City Division ("FBI SA") served an administrative subpoena to T-Mobile for subscriber information pertaining to the telephone number, (620) 926-8107, which MITCHELL provided to the OCE on JUNE 26, 2026. On the same date, T-Mobile responded and identified the subscriber as Richard MITCHELL at 222 North Massachusetts Street, Erie, Kansas 66733. The telephone number was active as of April 14, 2026.

17.     On July 08, 2026, FBI SA used open-source records to query Richard MITCHELL in Erie, Kansas. Mitchell was then fully identified as Richard Virgil MITCHELL, date of birth XX-XX-1962, Social Security Account Number XXX-XX-1314. FBI SA subsequently obtained various records pertaining to MITCHELL, including criminal history and a copy of MITCHELL's Kansas driver's license. MITCHELL's Kansas driver's license photograph closely resembled the image in the Adam4Adam profile for Rick691981. MITCHELL's criminal history indicated he was a registered sex offender, previously charged with indecent liberties with a minor in 2002. FBI SA checked the Kansas Bureau of Investigation's Sex Offender Registry and located an entry for MITCHELL. MITCHELL's photograph from the sex offender registry also closely resembled the image in the Adam4Adam profile for Rick691981. MITCHELL's address was listed as 428 North Massachusetts, Erie, Kansas 66733 (the "SUBJECT PREMISES"), which was current as of MITCHELL's last check-in on June 22, 2026.

18.     On July 10, 2026, a white Jeep Cherokee (Kansas license plate 257PTL) was parked in the driveway of the SUBJECT PREMISES. Investigators conducted a records check through Kansas Department of Revenue, and the white Jeep Cherokee (Kansas license plate 257PTL) is

8

registered to MITCHELL. According to MITCHELL's entry on the Kansas Bureau of Investigation's Sex Offender Registry, a white 1998 Jeep Cherokee (Kansas license plate 257PTL) is associated with MITCHELL's registration.

19.    On that same date, investigators observed MITCHELL exit the SUBJECT PREMISES and drive away from the SUBJECT PREMISES in a white Jeep.

## BACKGROUND ON CHILD EXPLOITATION OFFENSES, COMPUTERS, THE INTERNET, AND DEFINITION OF TERMS

20.    In this Affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256. The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

21.    Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers with child pornography:

a.    Computers and Child Pornography.  Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats. The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

b.    File Storage.  Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage"). Computer users frequently

9

transfer files from one location to another, such as from a phone to a computer or from cloud storage to an external hard drive. Computer users also often create "backup," or duplicate, copies of their files. In this way, digital child pornography is extremely mobile and such digital files are easily reproduced and transported. For example, with the click of a button, images and videos containing child pornography can be put onto external hard drives small enough to fit onto a keychain. Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets. Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device. Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

c.      Internet.   The term "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide. The Internet is not an online service and has no real central hub. It is a collection of tens of thousands of computer networks, online services, and single user components. In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

d.      Internet Service Providers.   Individuals and businesses obtain access to the Internet through ISPs.  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers;

10

remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP. ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them. Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

e.    An Internet Protocol address ("IP Address") is a unique numeric address used to connect to the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most Internet Service Providers ("ISPs") control a range of IP addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

f.    IP Address-IPv4 is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). In simple terms, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP. What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example. Because the home subscriber typically only has one Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home are connected to the Internet via a router or hub. Internet activity from every device attached to the router or hub is utilizing the same external IP Address assigned by the ISP. The router or hub "routes" Internet traffic so that it reaches the proper

11

device. Most ISPs control a range of IP Addresses. The IP Address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP Address is only assigned for the duration of that online session. Most ISPs maintain records of which subscriber was assigned which IP Address during an online session.

g.      IP Address – IPv6.   Due to the limited number of available IPv4 IP addresses, a new protocol was established using the hexadecimal system to increase the number of unique IP addresses. An IPv6 consists of eight sets of combination of four numbers 0-9 and/or letters   A    through    F.    An    example    of    an    IPv6    IP    address    is 2001:0db8:0000:0000:0000:ff00:0042:8329.

h.      The following definitions apply here:

i.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

ii.      "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where: (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

iii.      "Cloud-based storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users

12

over a network, typically the Internet. Users of such a service can share links and associated passwords to their stored files with other traders of child pornography in order to grant access to their collections. Such services allow individuals to easily access these files through a wide variety of electronic devices such as desktop and laptop computers, mobile phones, and tablets, anywhere and at any time. An individual with the password to a file stored on a cloud-based service does not need to be a user of the service to access the file. Access is typically free and readily available to anyone who has an Internet connection.

iv.     "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

v.     "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

vi.     "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work.

13

Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

vii.    "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

viii.    "File Transfer Protocol" ("FTP"), as used herein, is a standard network protocol used to transfer computer files from one host to another over a computer network, such as the Internet. FTP is built on client-server architecture and uses separate control and data connections between the client and the server.

ix.    "Encryption" is the process of converting data into a code in order to prevent unauthorized access to the data.

x.    "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

14

xi.    "Log files" are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

xii.    "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

xiii.    "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

xiv.    "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

xv.    "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

xvi.    A "storage medium" or "storage device" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

xvii.    "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

xviii.    A "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

## INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

22.    Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who view and possess multiple images of child pornography are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals:

a.    Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media, or from literature describing such activity. These individuals often maintain possession of these items for long periods of time and keep their collections in numerous places – in digital devices in their homes, in their cars, in their workplaces, or on their persons.

b.    Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials (including through digital distribution via the Internet); conceal such correspondence as they do their sexually explicit

16

material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. These individuals often maintain possession of these items for long periods of time.

23.    Digital child pornography on a digital device is easy to maintain for long periods of time. Modern digital devices often have extremely large storage capacities. Furthermore, cheap and readily available storage devices, such as thumb drives, external hard drives, and compact discs make it simple for individuals with a sexual interest in children to download child pornography from the Internet and save it – simply and securely – so it can be accessed or viewed indefinitely.

24.    Furthermore, even if a person deleted any images of child pornography that may have been possessed or distributed, there is still probable cause to believe that there will be evidence of the illegal activities – that is, the possession, receipt, and/or distribution of child pornography – at the SUBJECT PREMISES or on the SUBJECT PERSON. Based on my training and experience, as well as my conversations with digital forensic experts, I know that remnants of such files can be recovered months or years after they have been deleted from a computer device. Evidence that child pornography files were downloaded and viewed can also be recovered, even after the files themselves have been deleted, using forensic tools. Because remnants of the possession, distribution, and viewing of child pornography is recoverable after long periods of time, searching the SUBJECT PREMISES and SUBJECT PERSON, could lead to evidence of child exploitation offenses.

## DIGITAL DEVICES AND ELECTRONIC EVIDENCE

25.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

17

a.     Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remains on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.     Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.     The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.     Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law

18

enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

26.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for several reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

27.    Because several people may share the SUBJECT PREMISES as a residence, it is possible that the SUBJECT PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well. [1]  Based on my training, knowledge, experience, and conversations with others in law

---

[1] *See Zurcher v. Stanford Daily*, 436 U.S. 547, 553-560 (1978); *United States v. Baez*, 983 F.3d 1029, 1041 (8th Cir. 2020)("the legality of a search of [specified premises] pursuant to a valid warrant is not suspect-specific."); *United States v. Darr*, 661 F.3d 375, 379 (8th Cir. 2011); *United States v. McLellan*, 729 F.3d 200, 205 (1st Cir. 2015); *United States v. Vosburgh*, 602 F.3d 512, 519-27 (3rd Cir. 2010); *United States v. Jones*, 942 F.3d 634, 639-40 (4th Cir. 2019); *United States v. Perez*, 484 F.3d 735, 740-42 (5th Cir. 2007); *Peffer v. Stephens*, 880 F.3d 256, 272-73 (6th Cir. 2018);

(footnote cont'd on next page)

enforcement, I understand that an individual who possesses images and/or videos depicting CSAM on one digital storage device and/or Internet email or online storage account is likely to possess CSAM on additional digital storage devices and/or Internet email or online storage accounts that he possesses or controls. Additionally, based on this training and experience, I understand that even if the target uses a portable device (such as a mobile phone) to access the Internet and CSAM, it is more likely than not that evidence of this access will be found in his home, including on digital devices other than the portable device (for reasons including the frequency of "backing up" or "synching" mobile phones to computers or other digital devices).

28.     There is presently no evidence excluding any potential occupant of the SUBJECT PREMISES as having been involved in the child exploitation activity discovered herein. Based on Affiant's training and experience, it is common to discover there was more than one person in a residence who had knowledge or participated in child exploitation activity once the search is completed. It is uncertain whether there is only one subject responsible for the known or yet to be revealed child exploitation activity. Information obtained indicates there are multiple adult residents residing at the SUBJECT PREMISES. Based on the size of the residence and the number of occupants, it cannot be ruled out at this time that multiple people within the residence have been involved in the child sexual exploitation activity.

29.     Based on my training and experience, one person can claim ownership of a device only to discover the subject took the liberty to use the device to participate in the activity without it being directly connected to their primary device. Subjects involved in child exploitation activity commonly use more than one device for various reasons. At times, cell phones previously or currently used by one person may also be used by the responsible subject. For example, if the

_United States v. Gregory_, 795 F.3d 735, 741 (7th Cir. 2015); _United States v. Adjani_, 452 F.3d 1140, 1146 (9th Cir. 2006); _United States v. Grimmet_, 439 F.3d 1263, 1268-70 (10th Cir. 2006); _United States v. Smith_, 108 F.4th 872, 879 (D.C. Cir. 2024).

subject found their primary device to have issues, the subject will seek out other devices to continue the child exploitation activity. Even though it is likely the subject will take steps to keep the activity from being discovered, artifacts of such activity could be revealed by experienced investigators. The ability to perform previews of devices within the SUBJECT PREMISES will assure investigators are not leaving behind CSAM or evidence of any child exploitation activity.

## BIOMETRIC ACCESS TO DEVICES

30. This warrant permits the FBI to compel Richard MITCHELL to unlock any devices requiring biometric access subject to seizure pursuant to this warrant. The grounds for this request are as follows:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

21

c.    If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d.    If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f.    As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices will be found during the search. The passcode or password that would

unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

g.      I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h.      Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of MITCHELL to the fingerprint scanner of the devices found at the SUBJECT PREMISES; (2) hold the devices found at SUBJECT PREMISES in front of the face of MITCHELL and activate the facial recognition feature; and/or (3) hold the devices found at the SUBJECT PREMISES in front of the face of MITCHELL and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the

23

contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to compel MITCHELL to state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to compel MITCHELL to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## CONCLUSION

For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations 18 U.S.C. §§ 2251 (production of child pornography or attempt), 2252(a) (receipt and possession of child pornography or attempt), 2422(b) (coercion and enticement of a minor or attempt), and 1470 (transfer of obscene matter to a minor or attempt) will be found in a search of the SUBJECT PREMISES, as described in Attachment A-1, as well as on the SUBJECT PERSON, as described in Attachment A-2.

David Albers
Task Force Officer
Federal Bureau of Investigation

Sworn and Subscribed before me via Zoom this
10th day of July 2026

Honorable Brooks G. Severson
United States Magistrate Judge
District of Kansas

24

## ATTACHMENT A-1

### DESCRIPTION OF THE PREMISES TO BE SEARCHED

The location, 428 N. Massachusetts Street, Erie, Kansas 66733, is a one-story single-family home. The residence is white in color with a composite roof and a detached one-car garage. It is located on the southeast corner of N. Massachusetts Street and East State Street.



25

## ATTACHMENT A-2

## DESCRIPTION OF THE PERSON TO BE SEARCHED

The Person, Richard Virgil Mitchell, DOB XX-XX-1962, is a Caucasian male with gray hair and blue eyes, approximately 5 feet 10 inches tall, weighing approximately one hundred and ninety pounds. Mitchell's social security number is XXX-XX-1314 and his Kansas driver's license is K02317828. Mitchell resides at 428 N. Massachusetts Street, Erie, Kansas 66733.



26

## ATTACHMENT B

## PARTICULAR ITEMS TO BE SEIZED

Authorization is sought to search for and seize evidence that relates to violations of 18 U.S.C. §§ 2251 (production of child pornography or attempt), 2252(a) (receipt and possession of child pornography or attempt), 2422(b) (coercion and enticement of a minor or attempt), and 1470 (transfer of obscene matter to a minor or attempt). Authorization to search includes any detached structures from the primary premises if such additional structures exist that are owned, occupied and/or used by 428 N. Massachusetts Street, Erie, Kansas 66733 ("SUBJECT PREMISES") and the person of Richard MITCHELL (the "SUBJECT PERSON"). This authorization includes the search of physical documents and includes electronic data to include deleted data, remnant data and slack space. The seizure and search of computers and computer media will be conducted in accordance with the procedures set forth in the Affidavit submitted in support of this warrant. Items to be seized include the following:

1.      Computer(s), computer hardware, computer software, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that may be, or are used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

2.      Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs, including, but not limited to, P2P software.

27

3.      Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.      In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.      Any and all diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by the operator of [target's e-mail address] by use of the computer or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission,

or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.      Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

11.      Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12.      Any and all cameras, film, videotapes or other photographic equipment.

13.      Any and all visual depictions of minors.

29

14.     Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

15.     Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

16.     Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

17.     Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history, including:

a.     records of Internet Protocol addresses used;

b.     records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

18.     As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

19.     Cellular telephones, smart phones, wireless phones and any storage devices, such as SIM cards or flash memory devices attached to, inserted in or seized with the device, will be analyzed and the following data will be seized only to the extent that it contains or depicts evidence of violations of 18 U.S.C. §§ 2251, 2252,  2422, or 1470, including evidence reflecting use, dominion and control of the device:

a.     Communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data:

1. tending to indicate efforts to distribute, receive, possess or view images of minors engaged in sexually explicit conduct;

2. tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain electronic evidence tending to indicate the presence of images of minors engaged in sexually explicit conduct;

3. tending to identify co-conspirators, criminal associates, or others involved in the distributing, receiving or possessing of images of minors engaged in sexually explicit conduct;

4. tending to identify travel to or presence at locations that concern the existence of images of minors engaged in sexually explicit conduct;

5. tending to identify the user of, or persons with control over or access to, the subject phone; or

6. tending to place in context, identify the creator or recipient of, or establish the time of creation, receipt or modification of communications, records, or data above.